STATE v. JAMES

[118 N.C. App. 221 (1995)]

V

===

STATE OF NORTH CAROLINA v. EVERETT MAURICE JAMES

No. 9310SC649

(Filed 21 March 1995)

**1. Searches and Seizures § 65 (NCI4th)— defendant's mental limitations—voluntariness of consent to talk and be searched**

Notwithstanding evidence of defendant's mental limitations and testimony regarding his tendency to cooperate unilaterally

with police officers, there existed ample competent evidence to support the trial court's findings that defendant voluntarily agreed to talk to police officers who boarded a bus on which defendant was a passenger, to a search of his person, and to a search of his luggage and its contents.

**Am Jur 2d, Searches and Seizures § 83.**

2. **Searches and Seizures § 7 (NCI4th)— officers boarding bus—defendant passenger questioned—defendant escorted from bus—no seizure of defendant**

Competent evidence supported the trial court's findings of fact, and those findings supported its conclusion that defendant was not involuntarily detained or seized when officers boarded a bus on which defendant was a passenger and questioned him or when they escorted defendant from the bus where the evidence tended to show that the officers identified themselves, spoke in low tones, did not display weapons, and were entirely non-threatening in appearance and demeanor; the officers did not interfere with the ingress and egress of passengers from their seats; the door of the bus remained open; defendant himself testified that he accompanied the officers of his own free will; and no one made any statement to defendant about being under arrest when he and the officers left the bus.

**Am Jur 2d, Searches and Seizures §§ 10, 32.**

Appeal by defendant from judgments entered 24 September 1992 by Judge Henry V. Barnette, Jr. in Wake County Superior Court. Heard in the Court of Appeals 2 March 1994.

*Attorney General Michael F. Easley, by Assistant· Attorney General John G. Barnwell, for the State.*

*A. Larkin Kirkman for defendant-appellant.*

JOHN, Judge.

Defendant pled guilty to charges of trafficking in cocaine by transportation and trafficking in cocaine by possession and was sentenced to seven years imprisonment in addition to a fine of $50,000.00. He reserved the right to appeal denial of his previously filed motions to suppress.

Defendant contends the trial court erred by denying those prior motions in that (1) his purported consent to be searched was not voluntarily and intelligently given and (2) he was unconstitutionally "seized" by officers who had boarded the bus on which defendant was a passenger. For the reasons set forth herein, we find defendant's arguments unpersuasive.

The State's evidence on *voir dire* tended to show the following: On 28 March 1990, deputies of the Wake County Sheriff's Department and agents of the North Carolina State Bureau of Investigation (SBI) entered the Raleigh bus terminal for a joint "drug interdiction" operation. This involved investigation of buses originating in South Florida and New York for the purpose of detecting the possession and transportation of illegal substances.

Shortly after the officers' arrival, Special SBI Agent Bruce Black observed passengers leaving a bus which had originated in New York. He also noticed defendant standing outside the bus on the loading dock. Defendant seemed nervous and paced about until reboarding the bus. He then moved towards the rear of the vehicle, picked up a green and white duffel-type bag from the seat, and placed it in the overhead luggage bin. Defendant thereupon exited the bus and walked over to a pay telephone.

After defendant again boarded the bus, the officers commenced their "drug interdiction" procedures. In these efforts, neither weapons nor handcuffs are displayed (although the officers are armed with concealed weapons), the ingress and egress of passengers from their seats is not blocked, and the door of the bus remains open. The officers question each passenger about their name, point of origin and destination, speaking in quiet and pleasant tones.

Wake County Detective Ronnie Stewart and Agent Black entered the bus wearing jackets indicating their status as law enforcement officials and began talking with the passengers. Detective Stewart approached defendant. He displayed departmental identification and stated he was a police officer engaged in a routine check of the bus. Stewart asked if he could speak with defendant and defendant said, "yes." Defendant told the officer he was traveling from Newark to South Carolina. Following inquiry as to whether he had any luggage, defendant pointed to a green and white bag overhead on the luggage rack. Detective Stewart then informed defendant the officers were narcotics agents pursuing illegal drugs and weapons, and asked

STATE v. JAMES

[118 N.C. App. 221 (1995)]

defendant if he had "anything on him." Defendant answered "no," and gave permission for agents to look into the bag.

Agent Black opened defendant's satchel, removed a portable radio, and noticed that the battery compartment appeared worn and rusty. The compartment contained only a Phillips screwdriver. The screws on the radio also looked worn as if they had been screwed and unscrewed several times. At this point, Detective Stewart asked defendant if he would mind stepping off the bus so they could speak privately. Defendant did not respond verbally but exited the bus.

The officers escorted defendant to a non-public room in the terminal and obtained further consent from him to search defendant and his luggage. Agent Black opened the radio with a screwdriver and discovered that it contained several packages which he believed to be cocaine or crack cocaine. While Agent Black was opening the radio, defendant seemed very nervous and told the officers, "that's not my radio." A pair of pants in the bag also contained a tin foil package of white powder which appeared to be cocaine.

Agent Black then advised defendant he was under arrest, handcuffed him, and read him the Miranda warnings. Defendant indicated he understood his rights and agreed to be questioned without an attorney present.

According to Agent Black, defendant explained that a man named "Bogey" in South Carolina had paid him $1,200.00 to travel to New York. In New York defendant met a black male who opened the radio and placed the drugs inside. Defendant subsequently boarded a bus in Newark and was returning to South Carolina.

Detective Stewart also testified that he had worked with mentally retarded patients while employed at Dorothea Dix Hospital for approximately two years. Regarding defendant, Stewart observed "that he articulated well" and didn't "remember anything unusual about his demeanor or . . . him having any problems communicating." Stewart further emphasized he "didn't observe any problems that he had physically or mentally or any other thing. He seemed fairly normal to me."

Dr. Lily Oatfield, a psychologist specializing in the mentally handicapped, testified she met with defendant on 5 September 1990 and administered a battery of tests. The results revealed defendant's reading ability was confined to three or four letter words and that his math skills did not exceed a fifth grade level. She stated defendant

had been in classes for the mentally handicapped at school and that he had a verbal I.Q. of 70, performance I.Q. of 71, and full scale I.Q. of 70. Dr. Oatfield further testified concerning defendant's capacity to consent to a search as follows:

> Q: From what you have discovered about this young man, would you expect him to respond to the officers' questions for permission to search with a denial of that permission?
>
> . . . .
>
> A: With a denial from him? No, and particularly if the officers conducting themselves the way they said, seem to have done.
>
> Q: Would you explain why and then explain particularly—
>
> A: His whole posture towards me, or teachers, or others, he's been taught to be cooperative. Looking over the school records, you saw no indications of being a behavioral problem or being oppositional, and he's evidently been taught that if they're a cop, you're suppose [sic] to answer, a teacher you're suppose [sic] to be polite to. He's dependent, passive and doesn't likes [sic] friction or anything that would create a problem, and saying no to them might create a problem, certainly to a policeman.

Defendant's testimony contradicted that of Agent Black in certain respects and disavowed knowledge of the presence of cocaine in the bag. Defendant further testified he did not feel free to leave the officers' presence while on the bus and indicated the reason was the "cops had me." However, he also stated the officers treated him fairly, did not threaten or intimidate him, and did not pull or point a gun at him. He acknowledged exiting the bus and consenting to the searches on the basis of his own free will.

At the close of the *voir dire* evidence, defendant's motions to suppress evidence resulting from the search and arrest of defendant on 28 March 1990 were denied. The trial court made the following pertinent findings of fact:

> 45. When asked by his attorney why he did not hesitate to consent to the search, defendant testified that he thought he was doing the right thing.
>
> . . .
>
> 47. Defendant testified that the officers treated him fairly; that they were polite; and that they never did or said anything

threatening, coercive, or intimidating to force him to talk with them or to allow them to search his person or the bag he had with him. Until he was told he was under arrest, defendant said he was not afraid.

48. Defendant testified that when he agreed to talk with the officers, when he agreed to a search of his person, when he agreed to a search of the bag, and when he agreed to get off the bus to talk further with the officers he did so freely and voluntarily.

The trial court thereby concluded:

60. Under all the circumstances surrounding the defendant's interactions with the law enforcement officers on the bus on 28 March 1990, as described by Detective Stewart, Agent Black, and defendant, a reasonable person would have believed that he was free to refuse to talk with the officers, free to refuse to allow a search of his person and his belongings, and free to leave the bus if he chose to do so.

61. Under all the circumstances, the Court finds that defendant freely, knowingly, and voluntarily consented to talk with Detective Stewart, to a search of his person, to a search of the green and white-striped duffle bag and its contents, and to talk with Agent Black after being arrested and advised of his Miranda rights.

At the outset we note that in reviewing an order denying a motion to suppress, the appellate court must determine: (1) "whether the trial judge's underlying findings of fact are supported by competent evidence, in which event they are conclusively binding on appeal, and [(2)] whether those factual findings in turn support the judge's ultimate conclusions of law." *State v. Cooke*, 306 N.C. 132, 134, 291 S.E.2d 618, 619 (1982).

I.

[1] By his first assignment of error, defendant maintains the trial court erred by denying his motion to suppress evidence "result[ing] from the involuntary search of the defendant." He argues any consent to search he may have proffered was neither voluntarily nor intelligently given. We disagree.

Upon objection to the validity of a consent to search, the trial court must conduct a *voir dire* hearing to determine if consent was

STATE v. JAMES

[118 N.C. App. 221 (1995)]

voluntarily given. *State v. Fincher,* 309 N.C. 1, 5, 305 S.E.2d 685, 689 (1983). "[T]he question whether a consent to a search was in fact 'voluntary' or was the product of duress or coercion, express or implied, is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte,* 412 U.S. 218, 227, 36 L. Ed. 2d 854, 862-63 (1973).

"[A] defendant's subnormal mental capacity is a factor to be considered when determining whether a knowing and intelligent waiver of rights has been made." *Fincher,* 309 N.C. at 8, 305 S.E.2d at 690 (1983) (citing *State v. Jenkins,* 300 N.C. 578, 585, 268 S.E.2d 458, 463 (1980); *State v. Thompson,* 287 N.C. 303, 318-19, 214 S.E.2d 742, 752 (1975), *death sentence vacated,* 428 U.S. 908, 49 L. Ed. 2d 1213 (1976)). A "lack of intelligence does not, however, standing alone, render an in-custody statement [or a consent to be searched] incompetent if it is in all other respects voluntary and understandingly made." *Id.; see also Jenkins,* 300 N.C. at 585, 268 S.E.2d at 463 (mental deficiency only one factor in determining validity of defendant's waiver of right to counsel and corresponding statement to police) and *Thompson,* 287 N.C. at 323-24, 214 S.E.2d at 755 (waiver of Miranda warnings and subsequent confession valid where mental capabilities were limited but where waiver knowingly and intelligently waived).

In *State v. McDowell,* 329 N.C. 363, 407 S.E.2d 200 (1991) police officers arrived at an apartment with an arrest warrant for the defendant. The officers obtained consent to search the residence without a search warrant from Karen Curtis, a twenty-two year old mentally retarded woman who shared the apartment with defendant. *Id.* at 376, 407 S.E.2d at 207. Evidence revealed that while Ms. Curtis may have been able to understand she had the right to refuse the search, she responded favorably to authority figures and did "not have the will to disagree with someone in authority." *Id.* at 377, 407 S.E.2d at 207-08. Our Supreme Court determined that, "[d]espite the testimony cited by defendant as indicative of Curtis' limited mental abilities," there existed sufficient evidence of her voluntary and knowing consent to the search of the apartment. *Id.* at 377, 407 S.E.2d at 208.

Similarly, notwithstanding evidence of defendant's mental limitations and testimony regarding his tendency to cooperate unilaterally with police officers, there exists ample competent evidence in the case *sub judice* to support the trial court's findings. For example, we note defendant's testimony itself reflected consent to search based upon his "own free will." Further, the evidence suggests no coercive

STATE v. JAMES

[118 N.C. App. 221 (1995)]

behavior by the police, and defendant acknowledged they were neither threatening nor intimidating, nor did they display weapons of any sort. The court's findings in turn support its conclusion that defendant voluntarily and intelligently consented to being searched by the law enforcement agents. The trial court therefore did not err by denying defendant's motion to suppress "resulting from the involuntary search of defendant."

## II.

[2] Defendant also asserts the trial court erred by denying his motion to suppress grounded upon two alleged illegal seizures of defendant: first, when the officers boarded the bus and questioned defendant, and second, when they escorted defendant from the bus. Defendant's argument cannot be sustained.

Not every contact between a police officer and a citizen constitutes a "seizure." *Terry v. Ohio*, 392 U.S. 1, 19, n. 16, 20 L. Ed. 2d 889, 905 (1968). As the United States Supreme Court explained:

> We adhere to the view that a person is "seized" only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards. The purpose of the Fourth Amendment is not to eliminate all contact between the police and the citizenry, but "to prevent arbitrary and oppressive interference by enforcement officials with the privacy and personal security of individuals." As long as the person to whom questions are put remains free to disregard the questions and walk away, there has been no intrusion upon that person's liberty or privacy as would under the Constitution require some particularized and objective justification.

> Moreover, characterizing every [] encounter between a citizen and the police as a "seizure," while not enhancing any interest secured by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety of legitimate law enforcement practices.

> . . . .

> We conclude that a person has been "seized" within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.

*United States v. Mendenhall*, 446 U.S. 544, 553-54, 64 L. Ed. 2d 497, 509, *reh'g denied*, 448 U.S. 908, 65 L. Ed. 2d 1138 (1980) (citation omitted). Therefore, the test of an unconstitutional seizure involves a determination of whether a reasonable person, in view of all the surrounding circumstances, would feel at liberty to decline law enforcement officials' requests and to withdraw from their presence.

In *State v. Christie*, 96 N.C. App. 178, 385 S.E.2d 181, two narcotics officers boarded a bus at the Charlotte bus terminal and began speaking with passengers. *Id.* at 180-81, 385 S.E.2d at 182. The officers observed that defendant looked back at them several times, and that he "exhibited some characteristics associated with the drug courier profile." *Id.* at 181, 385 S.E.2d at 182. After identifying themselves and their purpose, the police requested permission to search defendant and his suitcase; he responded, "Sure, go ahead." *Id.* at 181, 385 S.E.2d at 183. The search disclosed twenty-five (25) pounds of marijuana in defendant's luggage. *Id.* at 182, 385 S.E.2d at 183.

This Court determined the foregoing evidence revealed defendant Christie was not "seized" in the Fourth Amendment context until he was arrested. We stated:

> First, [defendant] was not seized when the officers boarded the bus. Only two officers boarded the bus; they did not display any weapons; they did not use threatening language or a compelling tone of voice; and they did not block or inhibit defendant in any way from refusing to answer their questions or leave the bus. While defendant may have felt restrained from leaving the bus by the officers' presence, he had no reason to feel such restraint.
>
> . . . .
>
> Second, defendant was not seized when the officers began questioning him. . . . Applying the reasonable person standard of *Mendenhall*, a reasonable person in defendant's position would not have felt that he was compelled to stay in his seat and answer the questions.
>
> Third, a seizure did not occur because the officers boarding the bus was not more intrusive than necessary.

*Id.* at 184-85, 385 S.E.2d at 184-85.

*Christie* is thus dispositive of the issue of whether defendant herein was "seized" when agents boarded the bus and began questioning him. Competent evidence supports the trial court's findings

indicating that the officers identified themselves, spoke in low tones, did not display weapons, and were entirely non-threatening in appearance and demeanor. Further, they did not interfere with the ingress and egress of passengers from their seats, and the door of the bus remained open. Under the *Mendenhall* test, we cannot say the court's findings do not support its conclusion that a reasonable person in such circumstances would have felt free to leave.

With respect to whether a "seizure" took place when defendant exited the bus, *State v. Bromfield*, 332 N.C. 24, 418 S.E.2d 491 (1992), controls. In *Bromfield*, officers performing drug interdiction work at the Raleigh bus station noticed a group of persons matching the description of those being sought in connection with the death of two women. *Id.* at 29-30, 418 S.E.2d at 493-94. After the police approached and inquired as to the identity of these individuals, defendant agreed to accompany officers from the terminal to the police station. *Id.* at 37, 418 S.E.2d at 498. He was specifically informed that no charges had been brought against him and his movements about the station were unattended and unconfined. *Id.* Our Supreme Court ruled that the evidence supported the trial court's conclusion that the defendant was neither seized nor involuntarily detained. *Id.*

Similarly, in the case *sub judice*, the record reveals no physical restraint was imposed upon defendant when he exited the bus. Defendant himself testified he accompanied the officers of his own free will, and that he went with them because he wanted to. Further, Agent Black indicated no one made any statement to defendant about being under arrest when defendant and the officers left the bus. Accordingly, as in *Bromfield*, competent evidence supports the trial court's findings of fact, and those findings support its conclusion reflecting that defendant was not involuntarily detained or seized. *See also State v. Howell*, 335 N.C. 457, 468, 439 S.E.2d 116, 122 (1994). The trial court therefore did not err by denying defendant's motion to suppress based upon the alleged unconstitutional seizure of defendant.

Based on the foregoing, the order of the trial court denying defendant's motions to suppress is in all respects affirmed.

Affirmed.

Judges JOHNSON and GREENE concur.